UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:                                          Case No.: 16-13134-11

AARON HOLZHUETER,

Debtor.

AARON HOLZHUETER,

Plaintiff and Counter-Defendant,
v.                                              Adversary No.: 16-79

DAVID J. GROTH, GALE I. GROTH,
DAVID J. HEINECKE, JUDITH A.
HEINECKE, JAMES G. PRITCHARD,
JOHN W. TESCH, PATRICIA D. TESCH,
CARL A. NICHOLSON, GWENDOLYN R.
NICHOLSON,[1] and BARBARA L. WEGNER,

Defendants and Counter-Claimants.

## <u>MEMORANDUM DECISION</u>

This matter is before the Court on the motion of Aaron Holzhueter

("Plaintiff") for summary judgment pursuant to Fed. R. Civ. P. 56, made

applicable to bankruptcy proceedings through Fed. R. Bankr. P. 7056.

Plaintiff filed this adversary proceeding seeking a Declaratory Judgment under

28 U.S.C. §§ 2201 and 2202 and 11 U.S.C. § 502. On November 17, 2016, the

---

[1] On September 13, 2017, the Nicholsons agreed to withdraw their proof of claim in the underlying bankruptcy case and the Plaintiff agreed to dismiss his claims against them. The Nicholsons further stipulated that they will not reassert their claim against the bankruptcy estate. They are no longer a party to this adversary proceeding and their claim for nondischargeability under section 523(a)(19) will not be addressed in this decision. *See* ECF No. 78.

Defendants filed an answer and counterclaims alleging their claims are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(6), and 523(a)(19).[2]

## FACTS

Plaintiff filed a voluntary chapter 11 petition under title 11 of the Bankruptcy Code on September 12, 2016. He filed this adversary proceeding seeking a declaration that he is not liable for debts allegedly owed to the Defendants in connection with his father's fraudulent conduct. The Defendants filed an answer and counterclaims against Plaintiff alleging the debts are nondischargeable.

Plaintiff graduated from Carroll College with a degree in accounting. In 2002, at the request of his father, Loren Holzhueter ("Loren"), he began to work at Insurance Services Center ("ISC"). Sometime around 2005, Plaintiff was named ISC's Vice President, Treasurer, and Director.

In 2009, Quality Tax and Accounting Services LLC ("Quality Tax") was formed. It provided tax preparation services. In 2011, Plaintiff became the owner of 98% of Quality Tax. Plaintiff alleges that in 2014 Quality Tax changed the default setting in its tax preparation software. Before the change, Loren's name appeared as the preparer on all tax returns done by Quality Tax. Once

---

[2] The Defendants voluntarily dismissed their counterclaims under 11 U.S.C. § 523(a)(19) with prejudice. Additionally, they stipulated that all allegations asserting debts arising out of violations by Plaintiff of state securities laws were dismissed as well. As a result, dischargeability of those counterclaims will not be addressed in this decision.

that setting in the software changed, Plaintiff's name appeared as the preparer regardless of who actually did the taxes.[3] This change is undisputed.

In July of 2015, Plaintiff assumed the role of the Chief Executive Officer of ISC. In his various roles at ISC, Plaintiff had authority to write checks on the ISC accounts and occasionally served as a backup to ISC's long-time bookkeeper, Bonnie Jaeger ("Jaeger").

During the many years that Loren operated ISC, he apparently solicited funds from investors which he used to repay prior investments in the traditional Ponzi scheme manner. Checks from investors were deposited into ISC's general account. Jaeger would then record the investments in ISC's accounting software and write monthly checks for payments back to investors. Rather than put the funds toward investments as he promised, Loren would pay the investors using money from new investors. In total, Loren deceived approximately 150 individuals and families.

In 2013, Loren's scheme began to fray at the edges.  On November 7, 2013, the Internal Revenue Service raided ISC's offices, questioned its employees, and seized some of ISC's records. The *Milwaukee Journal Sentinel* published an article about the scheme in November 2014.

In January of 2015, the Securities and Exchange Commission ("SEC") filed a complaint against ISC in the Western District of Wisconsin alleging

---

[3] It should be noted that wherever Plaintiff's name appeared on a return, the tax return would have been prepared the following year. For instance, the 2014 returns could not have been prepared any earlier than January 2015.

securities violations and the existence of a Ponzi scheme.[4] On January 28, 2015, the District Court granted a Temporary Restraining Order ("TRO") that prohibited ISC from repaying individuals who had lent or invested money in ISC. Plaintiff and his mother, Arlene Holzhueter ("Arlene"), were added to that action as relief defendants to disgorge any funds they may have received from the Ponzi scheme.

On January 1, 2015, Plaintiff took over the management of ISC when Loren resigned from his position with the company. An Independent Monitor was appointed on February 11, 2015. On April 21, 2015, Loren died. Since 2015, Plaintiff has served as ISC's CEO. The District Court appointed a Receiver on October 20, 2016.

### *Mr. and Mrs. Groth*

On September 29, 2014, shortly before the Ponzi scheme became public knowledge, Mr. and Mrs. Groth exchanged a $30,000 check for a promissory note from ISC. Loren signed the note. The Groths thought the transaction was an investment and expected to receive interest payments of 7% every six months. At the time, they expected to be able to pull their money out whenever they desired. The Groths did not interact with Plaintiff in the negotiation of that transaction.

In December 2014, the Groths learned they would not be able to withdraw their investment. It is unclear how the Groths learned about the

---

[4] SEC v. Holzhueter, et al. (W.D. Wis. 15-00045).

Ponzi scheme. They appear to have heard the rumors about ISC and to have read a newspaper article about it.

Over the course of the Groths' relationship with Loren, they assert he repeatedly represented that Plaintiff "knew everything" about their account. Still, the first interaction the Groths had with Plaintiff was at Loren's funeral in April of 2015, well after their investment and after the filing of the District Court action. In that interaction, Plaintiff told Mr. Groth that he would get his money back. David Groth later spoke with Plaintiff on the phone and the assurance was repeated. The checks the Groths sent to and received from ISC are signed by Loren.

### _Mr. and Mrs. Heinecke_

Judith and David Heinecke started investing with Loren over 20 years ago. They contributed money to their investment account with ISC most recently in April 2011. In total, they put over $200,000 into investments with Loren.

The Heineckes were introduced to Plaintiff sometime in 2009 or 2010. Other than the initial introduction, the Heineckes admit they had no other interaction with Plaintiff. Loren told them Plaintiff would do their taxes. However, that was never verified directly with Plaintiff or any other source besides Loren. It is unclear who actually prepared the taxes and to what degree Plaintiff was involved in that process. Loren's name appears on the 2012 taxes as the preparer. The 2013 tax returns list Plaintiff as the preparer.

In April of 2011, Judith received checks as a payout from Pekin Life Insurance Company. The Heineckes signed the checks and then gave them to Loren for investment. The checks appear to be endorsed by Plaintiff for deposit to ISC.

In 2014, the IRS visited the Heineckes' house to discuss Loren's financial dealings. Concerned about their investment, the Heineckes called Loren to ask about what was going on. Loren told them not to worry about it. The Heineckes discovered that Loren was running a Ponzi scheme.

In summary, the Heineckes admit they never had any direct contact with Plaintiff besides the brief introduction in 2009. Indeed, when asked what led them to connect Plaintiff with the Ponzi scheme, Mr. Heinecke admits the only connecting threads were Plaintiff's signature on some deposited checks and Loren's statements about preparation of tax returns.

### *Mr. and Mrs. Tesch*

The Tesches began investing with Loren around 2003. Over the years, they invested about $80,000. Loren gave them printed accounting statements, but they never received a 1099 or other official form related to their investment.

The Tesches also did their taxes with Loren through Quality Tax. It is unclear precisely how long Loren had done their taxes, but Quality Tax did them from at least 2010 through 2015.

The Tesches met Plaintiff in January 2015, when he and Loren came to their home. The Tesches acknowledge that by that time "the whole world" knew about the Ponzi scheme. At that meeting, Loren assured the Tesches they

6

would get their money back and Plaintiff sat silently at his side. Still, Mr. Tesch represents neither he nor his wife spoke directly with Plaintiff about the investments.

The next time the Tesches saw Plaintiff was at Loren's funeral. Plaintiff told Mr. Tesch he would get all his money back, which Mr. Tesch says he understood to include interest.

The Tesches also did their taxes with Quality Tax through 2014. By the spring of 2015, the Tesches were using a different tax preparer, Matthew De Mark. The tax returns prepared by Mr. De Mark show investment income from the ISC investment, but the Tesches do not recall receiving a 1099. Like the other Defendants, the Tesches believe Plaintiff was involved in the Ponzi scheme because at some time Loren told them Plaintiff "knows what's going on."

### *James Pritchard*

In 2004, James Pritchard became involved in Loren's Ponzi scheme when he invested over $300,000. Loren represented to Mr. Pritchard that he had invested in three companies, but it was unclear whether those investments went to equity, bonds, insurance annuities, or some other investment vehicle. Over the years, Mr. Pritchard and Loren would meet to go over the investments and Loren would show him a report for the preceding year. Starting in January 2008, Mr. Pritchard also received monthly payments from Loren in the amount of $2,000. Starting in February of 2012, Plaintiff's name began appearing on

the signature line of those checks. Mr. Pritchard did not see the checks as they came in. Rather, the money was deposited directly into his account.

Loren prepared Mr. Pritchard's taxes for as long as he could remember. At some point Plaintiff became involved in doing the taxes, but his degree of involvement is unclear. From 2004 onward, the "investment" dividends were not reported on the returns.

Despite his ongoing relationship with ISC, he did not meet or interact with Plaintiff in the context of ISC or Quality Tax prior to 2015. Indeed, he admits the only person he ever spoke with about the investment was Loren. In January 2015, after hearing about the article in the newspaper, he drove to ISC's office. He met Plaintiff in the parking lot and demanded to know whether his accounts were safe, to which he asserts Plaintiff replied, "You bet. No problem. You'll get everything."

Subsequently, Mr. Pritchard reached out to Plaintiff in February and March of 2015 to inquire after the money. Plaintiff was vague, but assured him it would come. Mr. Pritchard admits that he did not do anything in reliance on Plaintiff's statement, but that he did expect the monthly payments to resume.

### *Barbara Wegner*

Ms. Wegner inherited her ISC investment account in 1999 and 2001. Ms. Wegner invested an additional $20,000 with Loren. Loren signed the receipt for that investment. Unlike her other investments, Barbara never received regular statements or cash payouts from that specific account.

In 2014, Barbara became concerned about the possibility of being laid-off from her job and went to see a financial advisor. When analyzing her investments, the advisor noticed the ISC account and decided to investigate whether Loren was properly licensed for investing. After discovering Loren was not licensed, the advisor informed Barbara that her investment accounts were likely empty. Barbara then asked Loren to return her money.

Ms. Wegner admits that her contact with Plaintiff was minimal. She never met with Plaintiff for investment advice. In 2014, Barbara spoke with Plaintiff on one occasion over the phone regarding the tax implications of selling a family member's house. But, she did not have any other direct contact with Plaintiff. Her 2010 and 2012 tax returns list Loren as the preparer. Her 2013 tax return, on the other hand, lists Plaintiff as the preparer. At no point, including 2013, did Plaintiff speak to Barbara about or go over her tax returns with her—that job was left for Loren. Her requests for payouts were to Loren. Her monthly payouts were received in the form of checks and at least one was signed by Plaintiff. The money was deposited directly into her bank account.

Barbara assumes Plaintiff was conspiring with Loren because (1) his name is on her 2013 tax return as preparer, (2) he signed at least one payout check that was deposited to her accounts, and (3) Loren told Barbara that Plaintiff knew everything. The statement was not made in front of Plaintiff.

## JURISDICTION

This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B) and 157(b)(2)(I). Venue is proper under 11 U.S.C. §§ 1408 and 1409.

## DISCUSSION

Under 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *See also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Under 28 U.S.C. § 2202, this Court has authority to order "necessary or proper relief based on a declaratory judgment or decree" after notice and hearing "against any party whose rights have been determined by such judgment."

Plaintiff filed this adversary seeking a Declaratory Judgment that he is not liable to the Defendants and that the Defendants' claims are disallowed against him and the bankruptcy estate. The Defendants seek a determination on their counterclaims that the claims are nondischargeable. Plaintiff has moved for summary judgment under Fed. R. Civ. P. 56.

### 1. *Summary Judgment Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (made applicable through Fed. R. Bankr. P. 7056). The Court must view all facts and indulge all inferences in the

light most favorable to the Defendant and determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986).

As a procedural matter, on summary judgment "the burden is on the moving party to establish that there is no genuine issue about any material fact, or that there is an absence of evidence to support the nonmoving party's case, and that the moving party is entitled to judgment as a matter of law." 20 Charles Alan Wright, Arthur R. Miller & Edward Cooper, *Federal Practice and Procedure* § 105 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

The nonmoving party—in this case the Defendants—must present evidence to show there is a genuine issue for trial. The nonmoving party may oppose the motion by "any of the kinds of evidentiary materials listed in Rule 56(c), except for the mere pleadings themselves." *Celotex,* 477 U.S. at 324. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### 2. *Burden of Proof*

In a nondischargeability action, the party claiming the debt is nondischargeable has the burden of proving by a preponderance of the evidence each element of an exception to discharge is satisfied. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Here, the Defendants have claimed the debt is nondischargeable and therefore bear the ultimate burden of proof at trial. Fed. R. Civ. P. 56(c) requires "the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. To survive Plaintiff's Motion for Summary Judgment, Defendants must therefore demonstrate a genuine dispute of material fact on each of the elements of section 523(a)(2)(A) or 523 (a)(6). *See Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-50.

3.   *Nondischargeability under 11 U.S.C. § 523(a)(2)(A)*

Under 11 U.S.C. § 523(a)(2)(A), a discharge in bankruptcy does not exempt a debtor from debt arising from false pretenses, a false representation, or actual fraud. A finding of nondischargeability for false pretenses or false representation requires that the creditor establish that the debtor made a knowingly "false representation of fact . . . with an intent to deceive" and "upon which the creditor justifiably relied." *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 471 (Bankr. N.D. Ill. 2011). A false representation in this context includes spoken and written statements, in addition to "conduct intended to create and foster a false impression." *Id.*

Scienter is a required element of any cause of action under section 523(a)(2)(A). *Id.* For purposes of false pretenses or actual fraud, "intent to deceive is measured by the debtor's subjective intention at the time the representation was made." *Id.* at 472. Thus, to survive Plaintiff's Motion for Summary Judgment, the Defendants must produce some evidence to show there is a genuine dispute of fact over each of the elements of a section

523(a)(2)(A) claim, including whether Plaintiff possessed the requisite intent under that section.

### a. Did Plaintiff obtain money through fraud?

As a preliminary matter, section 523(a)(2)(A) only applies to "money, property, services, or . . . credit, to the extent *obtained by* . . . false pretenses, a false representation, or actual fraud." *See Grogan.* 498 U.S. at 282 n.2 ("Arguably, fraud judgments in cases in which the defendant did not obtain money, property, or services from the plaintiffs . . . are more appropriately governed by § 523(a)(6)."). The Defendants have correctly alleged ISC and Loren obtained money through fraud, but have not alleged the Plaintiff obtained anything through that fraud. They allege at some time he received a dividend, in an unknown amount, as a shareholder of ISC, but whatever relationship that dividend may have had to the Ponzi scheme is unclear. Being the recipient of a payment, if any, the source of which was a Ponzi scheme, is not the equivalent of money obtained by Plaintiff from the Defendants. The Defendants have failed to make an initial showing that Plaintiff obtained anything from them through the fraud and therefore have failed to articulate a theory supporting this element of nondischargeability under section 523(a)(2)(A).

### b. Did Plaintiff make a false representation?

Even if the Defendants could show that Plaintiff directly and ultimately obtained money, the Defendants still cannot show the debt is nondischargeable under section 523(a)(2)(A). The Defendants have not identified any statement or conduct by Plaintiff prior to their investments that would have fostered the

impression that the investments were legitimate or that prompted the

investments. *See Jacobs*, 448 B.R. at 471. The Defendants allege Plaintiff was

complicit in the Ponzi scheme, but to prove that point they rely almost

exclusively on statements from Loren regarding Plaintiff's knowledge. Indeed,

most of the Defendants had no interaction with Plaintiff until after the

investments had been made and the Ponzi scheme became public knowledge in

November 2014. Further, Loren's statements all appear to have been made

after the investments occurred.

Only Ms. Wegner spoke directly with Plaintiff prior to November 2014,

and that conversation centered on a tax liability issue after selling her house.

The conversation was totally unrelated to the accounts fraudulently obtained

by Loren. As far as false pretenses or false representations, therefore, the

Defendants cannot show they relied on any statements or conduct by Plaintiff

prior to November 2014. That leaves the question, then, whether they could

show they justifiably relied on any conduct after November 2014 when Loren's

Ponzi scheme became public knowledge.

Under section 523, justifiable reliance depends on "the qualities and

characteristics of the particular plaintiff, and the circumstances of the

particular case, rather than of the application of a community standard of

conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995). A creditor may not

close his eyes to warning signs and "[i]f . . . obvious red flags are raised, the

creditor is required to investigate further." *Dancor Constr., Inc. v. Haskell (In re*

*Haskell)*, 475 B.R. 911, 922 (Bankr. C.D. Ill. 2012); *see also Organic Family,*
*LLC v. Pawlak (In re Pawlak)*, 467 B.R. 462 (Bankr. W.D. Wis. 2012).

Each of the Defendants admit that by November 2014 they either knew
about the article or had heard from some source that Loren may have been
involved in a Ponzi scheme. All of the investments had already been made. For
some, their discovery of the Ponzi scheme prompted them to reach out to ISC.
The Tesches and Mr. Pritchard each spoke to Plaintiff the following January, at
which point he assured them they would get their money back. They allege
they relied on those assurances.

By November 2014, it was obvious to anyone paying attention that Loren
was running a fraud. The Defendants never received an account statement
with any kind of granular detail, and when any of the Defendants asked Loren
what they were invested in, he gave vague and non-committal answers. Some
of the Defendants admit to never having seen a 1099 tax form. When Ms.
Wegner's advisor did a cursory investigation, he immediately discovered Loren
was not registered to offer investments. In other words, there were countless
warnings before November 2014.

Then came the final nail in the Ponzi scheme coffin. In November 2014,
the *Milwaukee Journal Sentinel* published an article that quoted IRS agents
involved in the investigation, provided a link to the search warrant issued in
the Western District of Wisconsin, and explained in detail how Loren
perpetrated the fraud. Mr. Pritchard and the Tesches each admitted to having
known about the article before speaking with Plaintiff in January 2015, when

he assured them they would get their money. The remaining Defendants either spoke with Aaron months later at Loren's funeral, or not at all. The Defendants could not possibly have justifiably relied on Aaron's assurances in January 2015 that they would get their money. The Ponzi scheme was not only public knowledge, it was the subject of a case in the District Court. The Defendants therefore cannot show Plaintiff was guilty of false pretenses or false representation under section 523(a)(2)(A). The money had been invested and lost by the time of these conversations. Statements regarding what may occur in the future are not representations of fact sufficient to support a claim under section 523(a)(2)(A).

Generally, the false representation must relate to present or pre-existing facts and cannot be merely unfulfilled promises or statements of future events. *Hartwig v. Bitter,* 29 Wis.2d 653, 656, 139 N.W.2d 644, 646 (1966); *Lundin,* 124 Wis.2d at 192, 368 N.W.2d at 684; *D'Huyvetter v. A.O. Smith Harvestore Prod.,* 164 Wis. 2d 306, 320, 475 N.W.2d 587, 592 (Ct. App. 1991). Statements in 2015 that the Defendants "would get their money" or that "it would come" were, at best, unfulfilled promises and not representations of fact.

### c. Did Plaintiff possess the requisite intent?

Moreover, the Defendants have failed to meet their burden on showing Plaintiff possessed the requisite intent. Under the 523(a)(2)(A) analysis, scienter relates to the subjective intention at the time the misrepresentation was made. *See Jacobs,* 448 B.R. at 471. The debt at issue was created when Loren fraudulently induced the Defendants to invest. The Defendants have all

16

admitted they had no contact with the Plaintiff before investing with ISC and

they have not produced any evidence that would show Plaintiff helped his

father solicit those investments. To support their assertion that he possessed

intent at the time of the transaction, the Defendants have produced checks

relating to initial investments that were endorsed for deposit by the Plaintiff.

But an endorsement on a check does not speak to his knowledge of the Ponzi

scheme. Even if the Defendants could prove that Plaintiff had intent to defraud

sometime over the course of their investment with ISC, they have failed to show

he possessed the requisite intent to defraud *at the time the fraud occurred.*

### d. Did Plaintiff commit actual fraud?

The foregoing does not end the inquiry under section 523(a)(2)(A). In

contrast to false pretenses and false representation, actual fraud requires

neither a misrepresentation nor reliance. *McClellan v. Cantrell*, 217 F.3d 890,

893 (7th Cir. 2000). Actual fraud has three elements: (1) a fraud occurred, (2)

the debtor had intent to defraud; and (3) the fraud created the debt that is

subject to the discharge dispute. *Nat'l Bank v. White (In re White)*, 444 B.R.

887, 896 (Bankr. S.D. Ind. 2010). A finding of actual fraud in this context does

not require a finding that the debtor made false representations. *See Husky

Int'l Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1593 (2016). "Although 'fraud'

connotes deception or trickery generally, the term is difficult to define more

precisely." *Id.* at 1586. The key element of a nondischargeability claim for

actual fraud is the scienter requirement: the underlying conduct must involve

"moral turpitude or intentional wrong." *Id.*

17

The focus of an actual fraud inquiry is on the defendant's state of mind at the time of the allegedly fraudulent conduct. *In re Jacobs*, 448 B.R. at 472. Actions or statements made after the original fraudulent conduct therefore do not establish the debtor had the requisite intent. *Id.* Still, the court may consider those subsequent actions to the extent that they speak to the debtor's state of mind at the time the relevant conduct occurred. *Id.*

Because "direct proof of intent is rarely available, scienter may be established through circumstantial evidence." *Id.* The court can infer an intent to deceive where a debtor "knowingly or recklessly made false representations that he knew or should have known would induce another to act." *Id.*

There is no dispute that Loren Holzhueter committed fraud that gave rise to debts owed by Loren. The dispute for purposes of this summary judgment motion is whether the Defendants can show Plaintiff's conduct and intent satisfy the elements of actual fraud.

The Defendants allege he participated in the fraud by soliciting investors, depositing "investment" funds into ISC's account, and writing checks out of ISC's account for investment returns. To that end, they have produced depositions, affidavits, and a handful of ISC checks and deposit slips signed by Plaintiff. Some of the deposits relate to the inaugural investments those Defendants made with ISC and are endorsed for deposit by Plaintiff, not Loren. The remaining checks represent payments to Defendants after the investments were made. As an initial matter, those checks do not speak to whether Plaintiff solicited investments—by definition those checks would have been written or

18

deposited after the Defendants had invested. None of the Defendants have alleged that Plaintiff personally solicited investments from them.

The Defendants rely on an affidavit from a Michelle Duddeck. Ms. Duddeck "knew Loren Holzhueter for many years ... and [that] he was associated with both ISC Inc. and Quality Tas." She asserts that in 2011 Plaintiff told her Loren invested money for some clients and that those investments did well. Thereafter, she met with Loren. It is on that basis the Defendants argue the Court should infer scienter. While these brief comments to Ms. Duddeck may have prompted her to meet with Loren – a man she had known "for many years" – they do not lead to the conclusion in this case that the Plaintiff played any part in soliciting or obtaining the investments the Defendants made with Loren.

The Defendants point to deposit slips that were signed by Plaintiff as evidence of knowledge. First, the sole fact that Plaintiff deposited funds into ISC's general account does not speak directly to his knowledge of a Ponzi scheme—at most it shows Plaintiff knew ISC offered investment services. But Defendants' argument on this point raises a separate and more poignant question: was Bonnie Jaeger guilty of fraud? Ms. Jaeger had been ISC's bookkeeper since 1989. The Defendants produced affidavits in which Ms. Jaeger explains the scope of her employment with ISC included general ledger, accounts payable, accounts receivable, and issuing checks. In other words, Ms. Jaeger had complete knowledge of ISC's accounts. Though Plaintiff had

authority to issue checks, he only occasionally served as backup to Ms. Jaeger, who performed most of ISC's accounting duties.

The Defendants have also submitted the affidavit of an expert they claim shows Plaintiff must have known about the Ponzi scheme. The expert claims "a very basic principle" that anyone working in an insurance agency would learn is that premium payments should never be deposited into a general account. Such deposits, he continues, would be "highly suspicious." While premiums should not be deposited in a general operating account, that does not equate to knowledge or participation in a Ponzi scheme. Further, if it did, the expert testimony would speak more powerfully on the question of whether Ms. Jaeger participated in the Ponzi scheme. Taken to its logical end, the Defendants' argument could implicate the entire ISC accounting department in Loren's fraud. The expert speaks only in generic terms. He does not take into account that Plaintiff was simply a backup to Jaeger. This affiant does not address the Plaintiff's knowledge as an insurance agency employee or his actual duties. Neither does deposit of checks in the wrong account demonstrate intent to deceive the Defendants in obtaining the funds or that the funds were wrongfully represented by Loren as investments.

The Defendants have produced a few checks signed by Plaintiff, which they believed at the time of receipt were payouts from their investments. Again, checks sent out of ISC's account are not evidence that Plaintiff *obtained* money. And besides, those checks were all sent well after the original fraud perpetrated

20

by Loren and therefore would not speak to Plaintiff's intent at the time the
fraud occurred.

In addition to the sent checks, the Heineckes produced checks from
Pekin Insurance which were given by them to Loren and then endorsed for
deposit to ISC by Plaintiff. The vast majority of the deposit slips and checks
filed by the Defendants are signed by Loren.

After discounting the checks and deposit slips signed by Loren and the
various irrelevant or unpersuasive affidavits from individuals who are not
parties to this adversary, the Court is left with the following:

(1)    A deposit slip from ISC which shows the Tesches deposited $2,000
       on August 19, 2008. Though this is signed by Loren, the Tesches
       allege, without any corroboration, their assumption that it was
       Plaintiff who wrote the word "investment" on it.

(2)    A check to Ms. Wegner dated February 10, 2012. Plaintiff signed
       the check, but Ms. Wegner admits she only spoke with Loren about
       the transaction.

(3)    Three checks from Pekin Insurance Company to the Heineckes, all
       dated in April of 2011, which were endorsed for deposit by Plaintiff.

(4)    Tax returns from several of the Defendants that list Plaintiff's name
       as "preparer."

       a.    2013 return for Mr. Pritchard in which Plaintiff is listed as
             the preparer. The return shows investment interest from ISC
             in the amount of $16,249.

21

    b.    2013 return for the Tesches in which Plaintiff is listed as the preparer. The return shows investment interest from ISC in the amount of $770.

    c.    Barbara alleges in her deposition that Plaintiff prepared her 2013 tax returns, but she discussed them only with Loren. Her tax returns from 2010 to 2013 show no interest from ISC.

(5)    None of the Defendants spoke with Plaintiff about investing or their investments until after the investments had been made. In fact, any discussions with Plaintiff occurred only after Loren's Ponzi scheme became public.

None of the produced evidence could lead to the conclusion that Plaintiff so much as knew about the Ponzi scheme, let alone that he intended to participate in it. Loren held ISC out as a provider of investment services. Indeed, the Defendants filed receipts from ISC, the heading on which advertises ISC as being in the business of "Auto, Home, Farm, Business, Life, Health, [and] *Investments.*" The mere fact that Plaintiff signed checks that were sent to Defendants does not show he knew about the Ponzi scheme or that he acted to create a debt by fraud. At most, they may show Plaintiff knew ISC offered some form of investment services—a fact known by the rest of the world, too.

The tax returns likewise fail to create an inference that Plaintiff knew about the Ponzi scheme. The Defendants have alleged that because Plaintiff's name appears as the preparer on some tax returns reflecting investment

returns from ISC after the investments had been made, he must have known about the Ponzi scheme. However, like the checks, the mere statement on a tax return that Plaintiff was the preparer or that the Defendants received interest from ISC only shows the software listed his name on the returns. There is no evidence he ever saw or actually prepared the returns. Even if he did see or prepare any of the returns, they merely would have shown he knew they received interest from ISC. It says nothing about whether Plaintiff knew of the Ponzi scheme. Further, any interest reflected on a tax return would have been received only after the investment was made.

Plaintiff does acknowledge that he worked on Mr. Pritchard's 2014 tax returns as they related to farming income. To that end, Plaintiff and Mr. Pritchard met in person sometime in 2015. Besides that interaction and his phone conversation with Ms. Wegner, Plaintiff did not directly speak with any of the Defendants about their taxes. The mere fact that Plaintiff's name is listed as "preparer" on a few tax returns simply does not show that he knew about his father's Ponzi scheme.

Besides those various contentions of fact, the Defendants have also alleged Loren told them that Plaintiff "knew everything" about their accounts and the business. The Court has considered those statements and has determined they are not sufficient to create a genuine issue of fact for trial. Fed. R. Evid. 802 serves as a general prohibition against hearsay. When a witness is unavailable, Fed. R. Evid. 804 provides a number of exceptions, none of which are applicable here. Loren's statements were not made while he

23

believed his death was imminent. Though it was undoubtedly a statement that would be against Plaintiff's interest, it isn't a statement against Loren's interest and therefore does not qualify under Fed. R. Evid. 804(b)(3). In addition, Fed. R. Evid. 803 provides a number of exceptions to the rule against hearsay, which are likewise inapplicable. For purposes of a trial, Loren's alleged statements would be excluded as hearsay. They therefore cannot create a genuine dispute of material facts for purposes of the trial.

At most, the proffered evidence *could* demonstrate Plaintiff was negligent in his failure to further investigate his father's investment scheme. But mere negligence is not "sufficient basis for deceit." *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. at 778, 788 (B.A.P. 10th Cir. 1998); *see also Wolf v. McGuire (In re McGuire),* 284 B.R. 481, 492 (Bankr. D. Colo. 2002) ("A 'dumb but honest' defendant does not satisfy the test of scienter."). Defendants have failed to produce evidence that would suggest there is a genuine dispute over whether Plaintiff had the requisite intent under section 523(a)(2)(A). The evidence does not create so much as an inference that he knew about the Ponzi scheme, and Defendants' counterclaim under section 523(a)(2) is dismissed.

4.   *Nondischargeability under 11 U.S.C. §523(a)(6)*

Section 523(a)(6) provides a debt is nondischargeable if it was incurred

through willful and malicious injury by the debtor. To show willful and

malicious injury, Defendants must show: (1) Plaintiff acted willfully, (2) Plaintiff

acted maliciously, and (3) Plaintiff's willful and malicious actions caused injury

to the Defendants' property. *Owens v. Powell (In re Powell)*, 567 B.R. 429, 434

(Bankr. N.D.N.Y. 2017). To meet the standard for willfulness, the Defendants

must show "a deliberate or intentional *injury*, not merely a deliberate or

intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61

(1998) (emphasis in original).

Maliciousness in this context is less well-defined, but has generally been

held to encompass "implied or constructive malice as well as actual malice." *In

re McGuffey*, 145 B.R. 582, 586 (Bankr. N.D. Ill. 1992). Implied malice may be

demonstrated "by the acts and conduct of the debtor in the context of [the]

surrounding circumstances." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94

F.3d 84, 88 (2d Cir. 1996) (internal quotations omitted); *see also Lee v. Ikner (In

re Ikner)*, 883 F.2d 986, 991 (11th Cir. 1989) ("Constructive or implied malice

can be found if the nature of the act itself implies a sufficient degree of

malice.").

The injuries sustained by the Defendants were the losses they sustained

in their dealings with Loren. As described above, the Defendants have failed to

produce evidence that would suggest Plaintiff knew about the Ponzi scheme.

Without having demonstrated knowledge of the scheme, it would be impossible

25

for the Defendants to show he intentionally caused them harm. Therefore, the Defendants have not produced any evidence that could lead to a presumption that Plaintiff intentionally caused them injury through fraud.

The Defendants rely heavily on the theory that Plaintiff committed civil theft and conversion in violation of Wis. Stat. § 940.20. They claim his failure to return funds upon their request created liability for conversion. But, like section 523(a)(2)(A), that statue requires proof of intentionality. *See State v. Elverman*, 2015 WI App 91, 366 Wis. 2d 169, 207, 873 N.W.2d 528 (2015). Defendants have failed to produce any evidence that would suggest Plaintiff intentionally concealed or retained possession of the accounts without the Defendants' consent. *See* Wis. Stat. § 940.20(1)(a).

As noted, the Defendants argue that his refusal to return the proceeds of the investments accounts amounts to conversion. First, the Defendants have not alleged in any of the evidentiary materials that they demanded the return of their investment accounts by Plaintiff prior to the entry of the TRO. While they all appear to have known about the Ponzi scheme sometime around November 2014, none of them spoke with Plaintiff until January 2015. At that point, the District Court's order forbade anyone from distributing the contents of the investment accounts.[5]

Nonetheless, the Defendants argue Plaintiff committed conversion in spite of the District Court's order because he voluntarily consented to the TRO. The Defendants' argument on this point is tenuous at best and raises the

---

[5] Case No. 15-cv-00045, ECF No. 20.

question whether they would also accuse the District Court of conversion. The

Defendants do not cite to case law to support this point. Rather, they rely on a

sentence plucked from the second edition of *American Jurisprudence* which

states "[w]here a defendant has intentionally put the property beyond his or her

power to return it, the plaintiff's failure to make a demand for the return of the

property does not preclude maintenance of an action for conversion." First, the

quoted text clearly states those circumstances do not *preclude* a finding of

conversion, not that they create a cause of action for conversion. Moreover,

upon investigation, that section of *American Jurisprudence* relies on a 1934

Supreme Court of Kansas case for support. In that case, the plaintiff had sued

for the conversion of items the defendant had already sold. *Schooley v. Kerr*,

139 Kan. 669, 33 P.2d 140, 141 (1934). That court held the plaintiff had

satisfied the elements for conversion, despite the fact that he had not

demanded the return of his property before it was sold. That principle is

entirely irrelevant here. The Defendants' accounts have not been sold or

converted—they were protected by the TRO from further improper use pending

the outcome of the District Court case.

More relevant to the case at issue, "the mere failure to comply with a

demand for the return of property is not sufficient, by itself, to constitute a

conversion where the defendant does not have it in his or her power, at the

time of the demand, to comply with it." 18 *Am. Jur. 2d Conversion* § 44. These

Defendants are only a few of the persons injured by Loren's actions. Even if

Plaintiff had control and the ability to release funds under Defendants' theory,

to have done so would have been potentially contrary to the rights and interests of those other people. After the entry of the TRO, Plaintiff had no power to return the investment funds to the Defendants. He acted pursuant to court order and therefore could not have committed conversion, regardless of whether the Defendants demanded the return of their accounts.

5.    *Allowance of Claims under 11 U.S.C. § 502*

Section 502 governs the allowance of claims. It states in relevant part that the court shall determine the amount of a claim and allow it, "except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." The Code further defines the term "claim" as a "right to payment." 11 U.S.C. §§ 101(5). Though not made explicit in the Code, the "meanings of 'debt' and 'claim' [are] coextensive." *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 552 (1990). *See also Collier's* § 101.05[1].

As discussed above, the Defendants have failed to create a prima facie case that Plaintiff obtained any money through Loren's fraud.  But more pointedly, they have also failed to create a prima facie case that they hold a claim against Plaintiff. In support of their section 502 argument, the Defendants allege Plaintiff committed civil theft and conversion in violation of Wisconsin law. Again, the Defendants have not produced evidence that would show Plaintiff acted with scienter, which is a requisite element of civil theft

under Wis. Stat. § 943.20. The Defendants therefore have not shown they have a right to payment for civil theft.

Under Wisconsin law, conversion requires a "distinct act of dominion wrongfully exerted over another's personal property." *Heuer v. Wiese*, 265 Wis. 6, 8, 60 N.W.2d 385 (Wis. 1953). Black's Law Dictionary defines "dominion" as control or possession. *Black's Law Dictionary* (10th ed. 2014). The Tesches and the Heineckes have produced checks signed for deposit by Plaintiff and which they allege serve as evidence of conversion. The mere fact that Plaintiff signed three checks for deposit does not amount to a showing that he personally exerted a distinct act of dominion over the Defendants' property. If it did, Ms. Jaeger would be guilty of conversion. Further, by the time Plaintiff gained check-writing authority at ISC, the actual funds from the Defendants and the other victims of Loren's fraud had been comingled for many years. Over the course of those years, Loren made withdrawals and thereby reduced Defendants' share in the account. When Defendants eventually spoke to the Plaintiff about the return of the money, it is questionable whether any of their funds still existed or could be identified.

The investment payout check produced by Ms. Wegner also fails to serve as evidence of conversion. If anything, paying money back to Ms. Wegner would show the Plaintiff *relinquished* control of property on behalf of ISC. The remaining Defendants, the Groths and Mr. Pritchard, have not produced any evidence that Plaintiff dealt directly with their property. The Defendants have therefore failed to make genuine dispute of fact on whether Plaintiff committed

29

conversion and have failed to demonstrate a right to payment under Wisconsin law. Defendants have not alleged any other theory under which they would be entitled to payment from Plaintiff.

Fundamentally, the Defendants have failed to demonstrate that Plaintiff had any meaningful connection to the Ponzi scheme. It is hard to imagine how they could ever allege a right to a payment when they cannot show intent, conduct, or whether the Plaintiff personally benefitted from the Ponzi scheme. The simple fact is that Plaintiff never owed a debt to the Defendants. In sum, the Defendants have failed to create a prima facie showing that they hold enforceable claims against Plaintiff and their claims will be disallowed under section 502.

## CONCLUSION

The Defendants have failed to produce evidence that would create a genuine dispute of material fact as to each element of their two theories of nondischargeability under sections 523(a)(2)(A) and (a)(6). The Plaintiff's Motion for Summary Judgment is granted.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Separate orders consistent with this decision will be entered.

Dated:  October 18, 2017

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge